Pasha HUNT–GOLLIDAY,
Plaintiff–Appellant,

v.

METROPOLITAN WATER RECLA-
MATION DISTRICT OF GREATER
CHICAGO, Defendant–Appellee.

No. 96–1332.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 11, 1996.

Decided Jan. 17, 1997.

Patricia E. Bender (argued), Chicago IL, for plaintiff–appellant.

Robert L. Abraham, Lisa Ann Goldberg (argued), Michael G. Rosenberg, Metropolitan Water Reclamation District of Greater Chicago, Chicago, IL, for defendant–appellee.

Before COFFEY, RIPPLE, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

In this lawsuit, Pasha Hunt–Golliday tossed everything in the kitchen, including the sink, at her former employer, the Metropolitan Water Reclamation District of Greater Chicago. She said the District engaged in race discrimination, gender discrimination, pregnancy discrimination and sexual harassment (two subsets of sex discrimination), discrimination due to her disabilities, retaliation against her for exercising rights under Title VII of the Civil Rights Act, and retaliation against her for exercising rights under the Americans With Disabilities Act. She also claimed that Metro Water intentionally inflicted emotional distress on her and that a conspiracy was afoot to deprive her of her rights. The district court dismissed half the claims on a Rule 12(b)(6) motion to dismiss, and that decision is not challenged on this appeal. Later, the district court dismissed the remaining claims on Metro Water's motion for summary judgment. It is that decision we review today on Ms. Hunt–Golliday's appeal.

"Discrimination suits" are a staple of federal court practice as we consider hundreds of cases each year falling under its general banner. In many cases of this sort we revisit old principles and restate and apply them to the unique facts of the case at hand. Consider, for example, the decision 24 years ago by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In 1996 alone, in published opinions alone, we restated and applied the "*McDonnell Douglas*" methodology for resolving discrimination claims in 26 cases where district courts granted defense motions for summary judgment. *Pasqua v. Metropolitan Life Ins. Co.*, 101 F.3d 514 (7th Cir.1996); *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281 (7th Cir. 1996); *Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860 (7th Cir.1996); *Geier v. Medtronic, Inc.*, 99 F.3d 238 (7th Cir.1996); *Testerman v. EDS Technical Prod. Corp.*, 98 F.3d 297 (7th Cir.1996); *Cheek v. Peabody Coal Co.*, 97 F.3d 200 (7th Cir.1996); *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353 (7th Cir. 1996); *E.E.O.C. v. United Parcel Service*, 94 F.3d 314 (7th Cir.1996); *Helland v. South*

*Bend Community School Corp.,* 93 F.3d 327 (7th Cir.1996); *McKenzie v. Illinois Dept. of Transp.,* 92 F.3d 473 (7th Cir.1996); *Miranda v. Wisconsin Power & Light Co.,* 91 F.3d 1011 (7th Cir.1996); *Johnson v. City of Fort Wayne, Ind.,* 91 F.3d 922 (7th Cir.1996); *Ford v. Wilson,* 90 F.3d 245 (7th Cir.1996); *Rabinovitz v. Pena,* 89 F.3d 482 (7th Cir. 1996); *Smart v. Ball State University,* 89 F.3d 437 (7th Cir.1996); *Adler. v. Glickman,* 87 F.3d 956 (7th Cir.1996); *Vitug v. Multistate Tax Comm'n,* 88 F.3d 506 (7th Cir. 1996); *Ost v. West Suburban Travelers Limousine, Inc.,* 88 F.3d 435 (7th Cir.1996); *Piraino v. International Orientation Resources, Inc.,* 84 F.3d 270 (7th Cir.1996); *Mills v. First Federal Sav. & Loan Ass'n,* 83 F.3d 833 (7th Cir.1996); *Fuka v. Thomson Consumer Electronics,* 82 F.3d 1397 (7th Cir. 1996); *Weisbrot v. Medical College of Wisconsin,* 79 F.3d 677 (7th Cir.1996); *Bratton v. Roadway Package Sys., Inc.,* 77 F.3d 168 (7th Cir.1996); *E.E.O.C. v. Our Lady of Resurrection Med. Center,* 77 F.3d 145 (7th Cir. 1996); *Wolf v. Buss (America) Inc.,* 77 F.3d 914 (7th Cir.1996); *Smith v. Cook County,* 74 F.3d 829 (7th Cir.1996). We affirmed the district courts in 21 of the 26 cases but found that the existence of disputed material facts in 5 cases made summary judgment inappropriate. *Bultemeyer v. Fort Wayne Community Schools; Wohl v. Spectrum Mfg., Inc.; E.E.O.C. v. United Parcel Service; Johnson v. City of Fort Wayne, Ind.; Piraino v. International Orientation Resources, Inc.* Because the criteria for granting motions for summary judgment, our standards for reviewing such decisions, and certain aspects of the law—like the *McDonnell Douglas* methodology—are well-known, we will dispense with restating the obvious. Now to the facts.

The plaintiff here is Pasha Hunt–Golliday (because hyphenated names get a bit clumsy when repeated often, we will, without intending any disrespect, shorten the plaintiff's name to "Golliday" in this opinion), who was fired from her job with the Metropolitan Water Reclamation District of Greater Chicago. She started working at Metro Water as a laborer in 1987 and obtained civil service status in 1990. She was promoted twice, ending up as a "fireman-oiler" at the time of her discharge in 1994. A fireman-oiler, by the way, is someone who changes the oil in gear drives in the middle of sewage settling tanks. The job also requires the lubrication and maintenance of various other pieces of machinery.

Between 1989 and 1991 Golliday inquired about a promotion to a higher position— "Operating Engineer I." At the time her inquiries began she was working at Metro Water's Stickney, Illinois, plant and had not yet been promoted to fireman-oiler. The chief operating engineer at the Stickney plant, Peter Casey, told her she needed to obtain certification from a national institute for power engineers and then would need a "letter of verification" from Metro Water to allow her to take the required city exam for the engineer position. Golliday apparently took the institute's classes and received the certification. By then she had received her promotion to fireman-oiler, and in connection with the change in positions she was transferred to Metro Water's Calumet plant in Chicago.

Golliday, even though a Calumet employee at that time, requested the letter of verification from Casey at the Stickney plant so she could take the 1991 city-wide engineer exam. Casey then mentioned another requirement: to get the verification letter, the City of Chicago required two years of high pressure boiler experience, which was unavailable to Golliday at Calumet and, in fact, at some point became unavailable to all fireman-oilers at Metro Water. (The only high pressure boilers were within Casey's unit at Stickney, and fireman-oilers stopped being assigned to work on them.) Casey, however, had previously issued letters of verification for others without requiring them to have high pressure boiler experience. According to his own testimony before Metro Water's civil service board in a hearing regarding Golliday (which we'll get to later), his policy on issuing the letters was "kind of loose." He wrote letters of verification, he said, for good workers in his section at the Stickney plant who had two years in the fireman-oiler position and received evaluation ratings of at least "meets standards." Because Golliday at that time did not work in his section and did not have

the two years as a fireman-oiler, she did not meet Casey's requirements.

Golliday next asked her immediate supervisor at Calumet, Terry Nolan, for a letter of verification. He confirmed that she needed two years of high pressure boiler experience and so he declined to issue the letter. She made several additional requests for the letter, and in January 1991 she was told by her head supervisor, Greg Cargell, that Metro Water did not have to issue her a letter of verification and if she persisted in asking for one she would "be given a hard time." Golliday persisted nonetheless.

In between requests for the letter of verification Golliday contacted Metro Water's internal equal employment officer, Frances Wilkins, in December 1990 because Golliday believed the refusal to issue the letter to her was based on her gender and race. No black woman held an operating engineer position. Golliday indicates she contacted Wilkins for consultation only; she did not file an internal complaint at that time and she does not argue that anyone else at Metro Water knew she talked with Wilkins.

Two years later, in February 1993, after not receiving the letter of verification, Golliday filed an internal complaint with Metro Water—alleging race and sex discrimination, retaliation for pursuing the letter of verification, sexual harassment by a supervisor, and several incidents she claimed made her work environment hostile. After an investigation, Wilkins found no evidence of discrimination, retaliation, or harassment, but she did recommend a review of how Metro Water issued letters of verification.[1] In April 1993 Golliday filed charges of sex and race discrimination with the EEOC.

Meanwhile, in early 1991, Golliday suffered a back injury at work. After several months of disability leave she returned to work, and Metro Water's doctor put a 50-pound restriction on the amount of weight she would be required to lift. On May 10, 1993, though, an orthopedist for Metro Water examined Golliday and found her fully physically able to work without any restrictions. Golliday does

not deny that the doctor so found, but she says she was not informed of his conclusion.

On May 18, 1993, Golliday, who by this time had transferred back to the Stickney plant, met with her supervisors, including Casey, to discuss her job evaluation. Golliday claims her supervisors took a hostile tone and attitude with her, which Metro Water disputes. All agree, however, that during the meeting Golliday suffered a panic attack and passed out. She was hospitalized for depression, allegedly brought on by her work environment, and was placed on disability leave while receiving psychiatric and psychological treatment for depression and anxiety. According to Golliday and her doctors, she became panicked, anxious, and lightheaded under stressful work situations, which included seeing any of her supervisors. She was granted a disability leave on May 18, 1993.

After 21 weeks on disability Golliday decided to return to work, at least in part because she did not want to lose her position at the Stickney plant, which under a collective bargaining agreement could happen after five months off. Her psychologist recommended against it, but after Golliday's pleas, her doctors authorized her to work on a trial basis. The salutation and body of their clearance letter read in full:

> To Whom It May Concern:
>
> Pasha Hunt–Golliday is a patient under our care here at the clinic. She is capable of returning to work, on a trial basis, on October 12, 1993.
>
> Please call if you have any further questions.

Upon her return on October 12, Golliday did not request a transfer or change in her job or any special accommodations for her mental condition.

Just before returning to work Golliday was again checked by a Metro Water doctor, who confirmed that she was physically able to resume all duties as a fireman-oiler, with no lifting restrictions. She says, however, that the doctor did not tell her about his assessment regarding her back. She also acknowl-

---

1. Apparently, in late 1991 Casey was told to stop issuing any letters of verification because his employees at that time could not meet the boiler experience requirement and his policy meant that his workers had been getting an advantage over fireman-oilers at other plants.

edges that she learned something from this doctor that she didn't know, for it was he who told her she was pregnant.

On October 12, 1993, Casey began the day by telling Golliday they had some "unfinished business"—meaning her May 1993 performance evaluation. Casey then told her that her job duties had increased—in testimony before the civil service board he indicated that her job duties probably doubled. Instead of working alone in one portion of the Stickney plant called a "battery," she was now required to cover four "batteries," although she would be working in tandem with another fireman-oiler as a partner. Moreover, she was told her job again included lifting heavy objects because the lifting restriction was removed as a result of her May and October physicals. Golliday expressed concern about lifting due to her back condition, as she had not been informed that the lifting restriction was removed, and because she was five weeks pregnant. Casey asked if her inquiries and complaints about lifting meant she was refusing to do her job as directed. Golliday said "no" and went out into the plant to start work. That afternoon she and her partner, she says, were forced to move some heavy tool boxes (weighing 300–400 pounds) with wheels that were defective. According to Golliday, this heavy job reinjured her back and caused her to develop abdominal pain. She went to the Metro Water nurse and then to a hospital, where she was allegedly told she was in danger of miscarrying.

Golliday called in sick the next day, October 13, claiming she hurt herself and was threatening miscarriage. As a result of her absence on October 13 and her leaving her job early on October 12, Metro Water suspended her for uncooperative behavior and failure to return to work. The suspension was ordered by Metro Water's general superintendent, Frank Dalton, who did not know about Golliday's pregnancy. According to Metro Water, Golliday apparently had a history of absenteeism and calling in sick on the same days that her husband (also a Metro Water employee) had off, although she disputes that fact. Dalton filed charges before Metro Water's civil service board on October 22, 1993, recommending that Golliday be discharged for her history of being uncooperative with supervisors, failure to return to work as directed, making a false injury claim on October 12, and inability to perform the essential functions of her job without posing a threat to herself or others due to her mental condition. Upon filing of the charges, Golliday's suspension turned into a "suspension pending discharge."

In December 1993 Golliday filed charges of retaliation and disability discrimination with the EEOC. After receiving a right-to-sue letter on those claims and the claims of April 1993, she filed this lawsuit in 1994.

While this case was pending before the district court, Metro Water's civil service board conducted its hearing on whether Golliday should be terminated. Testimony from her own therapist indicated that Golliday suffered panic attacks due to work and her relationship with her supervisors, was not capable of working, and should be off for an indefinite time. In August 1995, the civil service board discharged Golliday from her job at Metro Water, concluding that her ailments—both physical and psychological-materially impaired her performance and could create a hazard to herself and other employees.

After the Rule 12(b)(6) dismissal of some of the counts in Golliday's complaint, the remaining charges were: (1) pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., (2) failure to accommodate a disability under Title I of the Americans With Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., (3) retaliation for exercise of her rights under Title VII, and (4) an Illinois state law claim for intentional infliction of emotional distress. The district court found that in regard to each of these claims, Golliday failed to establish the existence of any proof regarding at least one essential element. Golliday contends that she demonstrated the existence of a prima facie case on each claim as well as genuine disputes regarding material facts, and that the judge disregarded her facts and improperly considered the record in the light most favorable to Metro Water instead of her.

Metro Water responds that although Golliday may allege and argue that disputed facts exist regarding the elements of her claims, the actual evidence she presented to the district court established no such facts and failed to meet her burden on essential elements. According to Metro Water, Golliday merely submitted a compilation of inadmissible documents without proper affidavits, authentication or foundation.

We note that Golliday did indeed submit numerous exhibits that consisted of, among other things, doctors' reports, unsworn statements, copies of certificates from training institutes, documents from Metro Water's records (including Golliday's performance evaluations), and Wilkins' internal investigation report, with no authentication or verification whatsoever.[2] We also note that both sides rely extensively on testimony given, under oath, at the civil service board hearing regarding Golliday's termination and at Golliday's own deposition, and our decision today rests primarily on that testimony as well.

### Pregnancy discrimination

Title VII of the Civil Rights Act prohibits an employer from "discriminat[ing] against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . [.]" 42 U.S.C. § 2000e–2(a)(1). The Pregnancy Discrimination Act brought discrimination based on pregnancy within a woman's protections against sex discrimination. 42 U.S.C. § 2000e(k). The Act provides that pregnant women are to be treated the same for employment-related purposes as other persons. An unlawful employment practice occurs whenever pregnancy is a motivating factor for an adverse employment decision. 42 U.S.C. § 2000e–2(m).

The district court analyzed Golliday's pregnancy discrimination claim under *McDonnell Douglas* and determined that because she failed to present any evidence that she was treated less favorably than a nonpregnant employee under identical circumstances she could not establish a prima facie case. In addition, even if she could establish a prima facie case, the district judge found that Golliday failed to show that Metro Water's stated reasons for discharging her were a pretext for discrimination.

■■■ Although Golliday's arguments are garbled, she appears to say that her pregnancy discrimination claim should not have been analyzed under *McDonnell Douglas* because she relies on direct rather than indirect proof. This is an odd argument because the *McDonnell Douglas* test is designed to make it easier, not harder, for a victim of discrimination to prove a case. But passing that, Golliday says her direct evidence is the fact that she was suspended the day after she told Metro Water that she was pregnant and in danger of miscarrying. Direct evidence is that which, "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 569 (7th Cir.1989). Golliday's evidence regarding timing of her suspension does not by itself carry the day. The fact that she was suspended the day

2. The parties bear the burden of identifying evidence that will facilitate the court in determining whether a material issue of fact exists. We have repeatedly indicated that we and the courts below are not obliged to scour the record looking for factual disputes. See *Flaherty v. Gas Research Institute*, 31 F.3d 451, 453 (7th Cir.1994); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir.1994). Here, Golliday provided a 2½-inch-high compilation of seemingly everything she obtained in discovery, with no index. She confusingly references each document as part of "group" 1 through 13 (and each group does not appear to have any common theme), then by an alphabetical letter as a subdivision. Finding the group numbers and subdividing letter-references in the exhibit is time-consuming, as there are no tabs or easily visible separations between the documents. Needless to say, between the unauthenticated documentation and the failure to put it in any coherent form, confirming and identifying the facts that Golliday argues in her brief has taken far more time than in cases far more complex. To make matters worse, Golliday periodically refers to an entire exhibit or all the exhibits in support of her arguments, failing to be more specific. For instance, a good example is found in her memorandum opposing summary judgment: "Plaintiff relies upon all exhibits submitted by her in connection with defending defendant's motion to show pretext in calling for her suspension and discharge." We admonish plaintiff's counsel to pay closer attention to the burden of adequately identifying evidence in any future cases before us and the district courts.

after announcing she was pregnant requires a presumption or at least an inference that the two events are related. She has absolutely no direct evidence proving that the two events are related—that any supervisor or decisionmaker regarding her employment admitted she was suspended because she was pregnant. Her claim is properly analyzed by using the *McDonnell Douglas* indirect method of proof—as we said, an *easier* test.

■ Suspicious timing does constitute circumstantial, or indirect, evidence to support a claim of intentional discrimination or disparate treatment. *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994). Golliday fails, however, to show any connection between her announcement and her suspension.

Metro Water does not dispute that Golliday was pregnant in October 1993 and that she was suspended from her job pending final termination. Whether she was performing her job well enough to meet her employer's legitimate expectations is a matter in dispute. But regardless of how that dispute is resolved, Golliday has failed to show that others who were not pregnant (or incapable of becoming pregnant) were treated more favorably than her. Golliday presented no evidence showing, for instance, that a nonpregnant employee returning from extended leave who left her job and called in sick after one day back would not have been suspended. Dalton, who suspended her and filed the charges with the board, did not even know that Golliday was pregnant. Although her immediate supervisors knew she was pregnant and originally brought the matter of her suspension to Dalton (whether they did so based on her pregnancy is pure speculation, since Golliday has presented no proof other than the suspicious timing), Golliday has shown no evidence that the person with authority—Dalton—failed to treat her just like any other worker with similar work problems would have been treated.

■ The only "evidence" Golliday presented regarding other workers was that she had heard that another woman who had been pregnant received some sort of accommodation during her pregnancy. That statement, which by the way is backed up with no further evidence, does not show that Golliday

fared worse than *non*pregnant employees. Casey may have been inconsiderate for not lightening Golliday's work load and lifting requirements due to her pregnancy. That does not, however, establish, on this record, a valid pregnancy discrimination claim. "With the PDA, Congress made clear that the decision . . . to work while being . . . pregnant . . . was reserved for each individual woman to make for herself." *International Union, United Auto. Workers v. Johnson Controls, Inc.*, 499 U.S. 187, 206, 111 S.Ct. 1196, 1207, 113 L.Ed.2d 158 (1991). The PDA does not require preferential treatment for a pregnant employee—just the same treatment as a nonpregnant employee would receive. Employers can treat pregnant women as badly as they treat similarly affected but nonpregnant employees without violating the PDA. *Troupe*, 20 F.3d at 738.

Golliday cannot even show· that she was treated worse than she would have been had she not announced that she just learned she was pregnant. Before hearing that Golliday was pregnant Casey had already told her what her new job duties would be; those duties did not change after he heard she was pregnant. She would have been required to do the same work either way. His disregard of her pregnancy means that he did *not* treat her differently than a nonpregnant employee. Summary judgment was properly granted to Metro Water on this claim.

*Failure to accommodate*

Golliday next claims that Metro Water failed to accommodate her back problem and her mental condition under the Americans With Disabilities Act of 1990. As such, her claim is not one for disparate treatment under the ADA, but instead is a claim for discrimination under the specific terms of the statute. *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1283 (7th Cir. 1996).

The ADA prohibits discrimination against a "qualified individual with a disability" because of such disability. 42 U.S.C. § 12112(a). "Qualified individual with a disability" means an individual with a disability who, with or without reasonable accommoda-

tion, can perform the essential functions of the employment position that such individual holds or desires. 42 U.S.C. § 12111(8). An employer discriminates against a qualified individual with a disability by

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer][.]

42 U.S.C. § 12112(b)(5)(A).

The district court determined that Golliday could not establish a prima facie case under the ADA because she did not prove she could perform the essential functions of her job and thus was not a "qualified individual" who happened to have a disability. The district court pointed to the undisputed evidence that Golliday suffers from depression and panic attacks, the testimony of Golliday's own psychologist indicating that she was not capable of returning to work at Metro Water, and Golliday's own testimony that the sight of her supervisors or anything reminding her of them caused her to have a panic attack.

Golliday points to various evidence to argue that the district court was wrong: her psychologist had authorized her to return to work on a trial basis in October 1993; other than the panic attack that she experienced at her May performance review, she had never experienced one during performance of any essential function of her job as fireman-oiler; and she had always received a "meets standards" review on her evaluations.

■ We determine that regardless whether these facts create a question as to her being a qualified individual, Golliday has provided nothing to show that even if she were a qualified individual with a disability Metro Water failed to make reasonable accommodations for her.

■ As the quote above indicates, "reasonable accommodation" is limited by the employer's knowledge of the disability. An

employee has the initial duty to inform the employer of a disability before ADA liability is triggered for failure to provide accommodations. *Beck v. University of Wis. Bd. of Regents,* 75 F.3d 1130, 1134–35 (7th Cir. 1996). *After an employee's request,* both parties bear responsibility for determining what accommodation is necessary. *Bultemeyer,* 100 F.3d at 1285. Once a disability has been summoned to the fore, determining what specific actions should be taken by an employer requires an interactive process involving participation by both sides. *Beck,* 75 F.3d at 1135.

> No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding · or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary.... [C]ourts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Id.*

Golliday fails to describe in her brief any reasonable accommodations for her mental illness. She merely claims that Metro Water "failed to explore with plaintiff the possibility of reasonable accom[m]odation when she broached the subject with defendant's internal EEO officer in February 1993 and when she made request for accom[m]odation during her testimony before defendant's Civil Service Board." Her first noted "broaching" of the subject of accommodation had nothing to do with any mental disabilities, and in fact predated many of her problems. The suggested solution she gave to Ms. Wilkins in February 1993 [3] was that her supervisors be required to attend sensitivity seminars in gender and cultural issues. When she met with Wilkins in February 1993 Golliday was concerned about correcting what she saw as racial and sex discrimination and harassment; she did not seek accommodation for her mental problems and panic attacks. In

---

**3.** Golliday does not argue that Metro Water should have known about her mental disability

prior to May 1993.

regard to her second request for accommodation, the record shows that at the civil service hearing she merely asked for a nonhostile working environment. Even if this could be considered a genuine request for accommodation for her mental condition involving panic attacks and stress, it occurred about 1½ years after her suspension and long after she filed this complaint—and that was way too late.

Golliday has failed to present anything at all regarding whether she informed Metro Water of her alleged mental disability and her need for accommodation, let alone what should have or could have been done for her. Upon her return to Metro Water, Golliday never indicated that her mental condition needed to be considered a disability. She simply returned to work to avoid being terminated. She did not request a change of shifts or modifications of facilities or suggest any other accommodation for her mental state. Her doctors' letter regarding her return, which we quoted earlier, stated that she was capable of working. It mentions nothing about her needing any special accommodation for a mental condition.

In *Bultemeyer* we recently stated that in a case where the employee has mental disabilities the communication process becomes more difficult and the employer must meet the employee half-way—if the employee may need an accommodation but does not know how to ask for one, the employer should do what it can to help. *Bultemeyer*, 100 F.3d at 1285. An employer cannot always expect an employee with a mental illness to know that she must specifically say "I want a reasonable accommodation." *Id.* In *Bultemeyer* the employer initiated the employee's return to work after a disability leave for mental illness and informed him right off the bat that he would not receive any special accommodations in his new position. After finding out what his new job entailed, Bultemeyer told the employer that he did not think he was equal to the task, but that he was not resigning. Bultemeyer then failed to report for work as directed. Within a week, Bultemeyer presented the employer with a letter from his psychiatrist stating that due to his illness, it would be best for him to return to a less stressful position than the one the employer planned. The employer nevertheless fired Bultemeyer for failing to report for work. As we noted earlier, *Bultemeyer* was one of the 5 (out of 26) 1996 reversals where we found that genuine issues as to whether the employer reasonably accommodated a disability precluded the trial court's grant of summary judgment. *Id.* at 1282. The employer had a duty, we said, to engage in an interactive process to find a reasonable way for Bultemeyer to work. The employer "had some responsibility, especially considering that it was well aware of Bultemeyer's condition, to take the small step of inquiring of Bultemeyer why he was so reluctant to take the physical and work at Northrop." *Id.* at 1286.

Unlike *Bultemeyer*, Golliday has not shown that she gave her employer enough basis for it to be held responsible for failing to inquire further. She initiated her return to work. Her doctors' letter gave no indication that she was mentally incapable of returning to her job or that she needed any accommodation. Golliday never stated that she was not equal to the task of doing what her job duties entailed. Metro Water's position in this case is not similar to the position of Bultemeyer's employer, the Fort Wayne Community Schools. In our case, in the absence of any evidence at all that Golliday informed Metro Water of a need for accommodation, Golliday must come up short.

█ Neither party focuses on whether Golliday's back condition constituted a disability for which Metro Water should have provided reasonable accommodation. We know that when Golliday previously injured her back, Metro Water restricted her lifting to 50 pounds, so such accommodations in general appear to be reasonable. According to Casey, when Golliday returned in October 1993 she did insist that she have restrictions for her back condition. Golliday's insistence was based on the restrictions given her in 1992, however, and an accommodation based just on the prior restriction was not reasonable in light of the more recent doctors' conclusions. Golliday does not dispute that just before her return Metro Water's doctors cleared her for full physical duties, and again

she has failed to point to any portion of the record showing that after being informed of that clearance she provided Metro Water with contrary information or medical evidence regarding her back condition. We note that the materials submitted by Golliday with her summary judgment response include a couple letters dated after Golliday's day of work in October 1993. The letters, addressed "To Whom It May Concern" and apparently handwritten and signed by doctors, indicated back pain on her part. These letters were not authenticated and, most importantly, nothing indicates that Metro Water ever saw them. Again, Golliday has failed to provide any admissible proof to support her ADA claim, and the district court correctly dismissed it.

### Retaliation

■ Title VII prohibits discrimination against employees who oppose unlawful employment practices or participate in any charge or investigation under the Act. 42 U.S.C. § 2000e–3(a). An actual violation of Title VII by the employer is not a prerequisite for a retaliation claim; the employee need only have a sincere and reasonable belief that she is challenging conduct that violates Title VII. *Holland v. Jefferson Nat'l Life Ins. Co.,* 883 F.2d 1307, 1314 (7th Cir. 1989).

The *McDonnell Douglas* burden-shifting test applies to Golliday's retaliation claim just as it did to her pregnancy discrimination claim. *Knox v. State of Indiana,* 93 F.3d 1327, 1333 (7th Cir.1996). To establish her prima facie retaliation case Golliday must show (a) that she engaged in statutorily protected expression, (b) that she suffered adverse action by her employer, and (c) that a causal link exists between the protected expression and the adverse action. *Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1457 (7th Cir.1994). Under the *McDonnell Douglas* test, Metro Water can rebut the inference from a prima facie case with a legitimate nondiscriminatory reason and shift the burden back to Golliday to show pretext.

Golliday has not provided any evidence that she took any action under Title VII prior to February 1993, so Metro Water's conduct before that date need not be considered. But as we have noted, Golliday did file a complaint with Ms. Wilkins, Metro Water's internal equal employment opportunity officer, on February 1, 1993, and another one with the E.E.O.C. on or about April 28, 1993. Casey testified that in the winter of 1993 he met with Wilkins for six to eight hours regarding Golliday's internal charges, so it is clear that at least one of her supervisors had knowledge of the internal complaint. It of course is undisputed that she suffered adverse actions by her employer—the initial suspension and the suspension pending termination. It follows, then, that the first two elements of a prima facie case are satisfied.

■ On the third element, the district court determined that Golliday failed to show a causal link between her protected activity and her problems with her supervisors or her termination. The court believed her problems at work began with her requests for a letter of verification and promotion rather than any protests of discrimination, and these problems began long before her February 1993 internal complaint. On this point, we disagree.

To establish a causal link, Golliday only had to establish "that the protected activity and the adverse action were not wholly unrelated." *Simmons v. Camden County Bd. of Educ.,* 757 F.2d 1187, 1189 (11th Cir.1985), quoted in *Holland,* 883 F.2d at 1315 n. 4. Once again, suspicious timing does constitute circumstantial, or indirect, evidence to support a claim of discrimination. *Troupe,* 20 F.3d at 736. This time Golliday has more than mere speculation to support an inference that her protected activity and Metro Water's acts are linked. Interpreting the facts in her favor, she can show a pattern of criticism and animosity by her supervisors following her protected activities. A pattern like that presented here supports the existence of a causal link.

For instance, Casey admits that in early to mid–1993 he prepared a report about Golliday's attendance after reviewing records indicating the days off that both she and her husband had taken. Casey indicated that Golliday's husband's records were not nor-

mally in his possession—he requested them from a different section of Metro Water. His report was a basis for criticism during her evaluation and one of the reasons given when she was suspended pending discharge.

According to Golliday, as a fireman-oiler she was responsible for filling in "lube cards," or assignment cards, which listed equipment to be serviced and presumably required a record by the fireman-oiler of work done on the machinery. In early February 1993—about a week after her internal complaint was filed—Golliday was accused of not properly filling out or turning in her lube cards because nobody could find them. For this infraction her supervisor reported her to his superiors. Golliday testified at her civil service hearing that she had easily found the lube cards in the desk where she had been told to place them.

A treatment plant operator at Metro Water, Henry Bailey, testified at the civil service hearing that in early May 1993 Golliday contacted him about a piece of equipment that broke down. She told Bailey she was unable to locate her own supervisors before calling him. Because of her actions, Bailey was able to fix the problem before any more damage occurred, which easily could have happened had more time elapsed. Bailey sent a commendation letter about Golliday's actions to her supervisors. According to Golliday, her supervisors reacted with a warning rather than thanks—by contacting Bailey before her own supervisors she failed to follow proper procedure.

According to Golliday's testimony at her civil service hearing and deposition, her May 1993 evaluation was poorer than in years past and she was subjected to hostility during the evaluation. She testified that the atmosphere during the evaluation was so confrontational that she became stressed. All admit that she passed out during the meeting.

Golliday testified that her supervisors' hostility continued when she returned in October. To support her statement that the completion of her evaluation was as hostile as the first portion held in May, Casey himself admits that upon her return he told her they had "some unfinished work to take care of."

Casey also admits he doubled her work load on her first day back, and Golliday was, of course, suspended almost immediately upon her return to the job.

Metro Water argues that the events of October 1993 are too far removed from Golliday's protected Title VII actions of February and April 1993 to be considered retaliation. We disagree. Golliday's evidence, viewed as true at this point, plausibly makes the case that her supervisors picked up right where they left off in May 1993 without skipping a beat due to her disability leave. We think that the timing of her complaints and the numerous criticisms of her following close on the heels of her protected Title VII activity, her evidence regarding the tone of her evaluation, the alleged doubling of her work load, the timing of her suspension so soon after her return to work, and other incidents in the record create an inference of causality that, if true, gets her past the prima facie stage regarding her retaliation claim.

█ As its legitimate reason for suspending Golliday, Metro Water presented the district court with testimony regarding Golliday's chronic absenteeism and disregard of supervisors' instructions, which were specifically referenced in her May 1993 evaluation and her notification of suspension pending discharge. Golliday says, however, that Metro Water's allegation regarding absenteeism was a mere pretext for discrimination, pointing to her testimony at her civil service board hearing that her "chronic absenteeism" was nothing more than excused absences and disability time. She also contends that the charge of disregarding her supervisors' instructions was pretextual, as indicated by instances such as those involving the lube cards and the rebuke following the Bailey commendation letter, which show that her supervisors' "instructions" were unreasonable or made up especially for her. We again think that she has shown enough to get past, if ever so slightly, early defeat on this issue on summary judgment.

Metro Water also points to what turned out to be the actual reason for her dismissal by the civil service board-that she was a danger on the job. In reaching its August

1995 decision to terminate her, the board looked at her panic attack and fainting during her evaluation, her own statements that the sight of her supervisors caused the panic attacks, and her psychologist's testimony that she was not capable of returning to the job. Because this case was filed before the board's decision and the district court did not permit Golliday to amend her complaint to include a claim that her termination also was part of the retaliation, we look at the circumstances surrounding her suspension and suspension pending discharge, not at the validity of the board's final decision almost two years later. Metro Water based Golliday's original suspension solely on its view of her insubordination, not on her mental condition. And although her mental condition was thrown in as a reason for her suspension pending discharge, the facts concerning her mental state as set forth in the statement of charges against her include only the May fainting episode and letters from her doctors that as of June 1993 she was under their care and being given medication. At the time of her return to work, Metro Water had the letter from Golliday's psychiatrist and psychologist clearing her for work, with no indication that any mental problems still existed. Regardless of whether her mental condition became a legitimate basis for her termination after her psychologist's testimony at the civil service board hearing, Golliday's evidence regarding a pattern of retaliation and the lack of substantial evidence on her mental condition that would have been known to Metro Water at the time of her suspension get her past summary judgment on this count.

*Intentional infliction of emotional distress*

In order to win a case for intentional infliction of emotional distress under Illinois law, Golliday would have to prove: (a) extreme and outrageous conduct; (b) intent to cause or a reckless disregard of the probability of causing emotional distress; (c) severe or extreme emotional distress; and (d) actual or proximate causation of emotional distress by outrageous conduct. *Doe v. Calumet City*, 161 Ill.2d 374, 392, 204 Ill.Dec. 274, 641 N.E.2d 498 (1994); *Knysak v. Shelter Life Ins. Co.*, 273 Ill.App.3d 360, 370, 210 Ill.Dec. 30, 652 N.E.2d 832 (1995).

When an injury occurs in the workplace, however, the Illinois Workers' Compensation Act, 820 ILCS 305/1 et seq., provides the exclusive remedy for accidental injuries. The Act establishes liability without fault and abrogates common law defenses. *Richardson v. County of Cook*, 250 Ill. App.3d 544, 547, 190 Ill.Dec. 245, 621 N.E.2d 114 (1993). Under the Act, an employee has no right to recover damages from the employer or its agents or employees for accidental injuries incurred in the course of employment. *Id.;* 820 ILCS 305/5(a) and 305/11.

Golliday does not dispute that to avoid preemption by the IWCA she must demonstrate one of the following: (i) the injury was not accidental, (ii) the injury did not arise from her employment, (iii) the injury was not received during the course of her employment, or (iv) the injury is not compensable under the Act. *Meerbrey v. Marshall Field and Co.*, 139 Ill.2d 455, 463, 151 Ill.Dec. 560, 564 N.E.2d 1222 (1990); *Richardson*, 250 Ill.App.3d at 547, 190 Ill.Dec. 245, 621 N.E.2d 114. According to the district court, with whom we agree, Golliday's own allegations prevent her from arguing (ii) through (iv). Golliday really does not seriously dispute the point.

In regard to (i), under Illinois case law an injury that was intentionally inflicted upon an employee by another employee nevertheless is considered "accidental" on behalf of the employer if it was unexpected and unforeseen by the injured party, unless the employer expressly authorized the co-employee to commit the tort. *Meerbrey*, 139 Ill.2d at 463, 151 Ill.Dec. 560, 564 N.E.2d 1222; *Richardson*, 250 Ill.App.3d at 548, 190 Ill.Dec. 245, 621 N.E.2d 114. Because injuries intentionally inflicted by a co-worker are accidental from the employer's point of view, the employer has a right to consider that the injured employee's sole remedy against the employer will be under the IWCA. *Meerbrey*, 139 Ill.2d at 463–64, 151 Ill.Dec. 560, 564 N.E.2d 1222.

The IWCA exclusivity provisions will not bar a common law cause of action

against an employer, however, for injuries that the employer or its alter ego intentionally inflicts upon an employee or which were commanded or expressly authorized by the employer. *Meerbrey,* 139 Ill.2d at 464, 151 Ill.Dec. 560, 564 N.E.2d 1222; *Richardson,* 250 Ill.App.3d at 548, 190 Ill.Dec. 245, 621 N.E.2d 114. But the fact that a supervisor was acting within the scope of his or her authority does not equal authorization by the employer for the commission of an intentional tort. *Meerbrey,* 139 Ill.2d at 465, 151 Ill.Dec. 560, 564 N.E.2d 1222; *Richardson,* 250 Ill.App.3d at 549, 190 Ill.Dec. 245, 621 N.E.2d 114. The Act's exclusivity provisions bar employees from bringing common law actions against their employers based solely upon the respondeat superior doctrine. *Meerbrey,* 139 Ill.2d at 465, 151 Ill.Dec. 560, 564 N.E.2d 1222.

Golliday has provided no evidence indicating that the alleged injurious actions against her, even if true, were anything other than unforeseen or unexpected as far as Metro Water itself is concerned. She contends only that she did present evidence that Greg Cargell, her head supervisor at one time, told her she would be given a hard time if she persisted about the letter of verification and that thereafter she "was subjected to a barrage of humiliating acts" by her supervisors, although she gives no specific examples. Golliday has presented nothing indicating that Cargell had sufficient stature to be considered Metro Water's alter ego or that Metro Water itself (or some other alter ego) commanded or authorized the alleged improper acts by Golliday's supervisors. She provides no evidence that Cargell even had any contact with her other supervisors and directed them to humiliate her. Although we have found that she may be able to prove an intentional pattern of retaliation against her by her supervisors, such a pattern does not automatically mean that Metro Water itself intended her to suffer emotional distress as a result. We thus agree with the district court that Golliday has failed to provide any evidence that her mental injuries were not accidental as that term is defined under the IWCA. Summary judgment on this point was proper due to preemption by the IWCA.

So in the final analysis, we conclude that the able district judge correctly put an early end—on a Rule 12(b)(6) motion and a motion for summary judgment—to about 90 percent of the claims in Golliday's rambling complaint against Metro Water. All aspects of the judgment below are AFFIRMED except for the dismissal of the retaliation claim. As to that claim, the judgment is REVERSED and the case is REMANDED for further proceedings. The parties shall bear their own costs.