**Rosa VARGAS, Plaintiff,**

v.

**GLOBETROTTERS ENGINEERING CORPORATION, Defendant.**

No. 97 C 2206.

United States District Court,
N.D. Illinois,
Eastern Division.

May 7, 1998.

---

Cary E. Donham, Elizabeth A. Fegan, Shefsky, Froelich & Devine, Ltd., Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge.

Plaintiff Rosa Vargas filed this suit against her former employer, Globetrotters Engineering Corporation (GEC), alleging that GEC violated the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601–2654, and the Pregnancy Discrimination Act (PDA), 42 U.S.C. § 2000e(k), when it terminated her employment after she took a maternity leave. GEC has moved for summary judgment on both claims. For the reasons set forth below, the motion for summary judgment is denied.

### I. Background[1]

GEC is an architectural consulting firm located in Chicago. The firm obtains work from its clients by bidding on particular projects, and because most of these projects are related to the construction industry GEC generally has more work in the spring, summer, and fall than in the winter. Because GEC's staffing needs fluctuate depending on the number of projects it is working on, it is commonplace for company employees to experience periods where there is no work available for them. *See* Haithcox Dep. at 63–64, 69.

In 1994 GEC hired Vargas as a "field secretary," *see id.* at 19, which meant that she served as a secretary at project sites rather than at GEC's headquarters.[2] The main difference in qualifications between field secretaries and secretaries working at headquarters is that the latter generally must be able to type at least 70 correct words a minute, while the former need only type 50. *See id.* at 20; Cohen Aft. ¶ 5. The reason for this distinction is that headquar-

Ernest Thomas Rossiello, Elena M. Dimopoulos, Annice M. Kelly, Ernest T. Rossiello & Associates, P.C., Chicago, IL, for Plaintiff.

---

**1.** The facts in this section are derived from the parties' submissions pursuant to Local Rules 12(M) and 12(N). For simplicity's sake we will not provide citations for propositions about which the parties appear to agree. For disputed points we will cite directly to the exhibits provided by the parties rather than to their Rule 12 statements. Any factual disputes which we cannot definitively resolve by reference to the exhib-

its will be resolved, for purposes of this motion only, in favor of the plaintiff.

**2.** GEC appears to use the terms "secretary," "word processor," and "administrative assistant" interchangeably. *See* Haithcox Dep. at 13, 21. The only important distinction for our purposes is the difference between secretaries and "field secretaries."

ters secretaries are frequently involved in preparing lengthy documents while field secretaries are not.

In 1996, Vargas worked as a field secretary for GEC's State Street Project. Vargas was aware that this project had an anticipated completion date of December 1996. During the year Vargas learned that she was pregnant and that her due date was in December. In October she informed GEC that, pursuant to her rights under the FMLA, she would take five weeks of unpaid maternity leave starting on December 6, 1996. This seemed like a good time for Vargas to take a maternity leave since it coincided with the end of the State Street Project, but neither Vargas nor GEC knew for certain whether there would be work available for her in January when she planned to return. *See* Haithcox Dep. at 64, 69, 72; Vargas Dep. at 105.

When Vargas attempted to return to work in January there were no field secretary positions available. GEC's personnel director, Patrick Haithcox, suggested that Vargas take a typing test to see if she could qualify for a secretarial position at company headquarters. Haithcox Dep. at 77. Vargas did so, but despite being permitted to take the test twice was unable to type more than 61 correct words per minute. Haithcox told Vargas that she had not qualified for a secretarial position at headquarters, but encouraged her to keep in touch with him about the possibility of working on a prospective project at the Lincoln Park Zoo.

Since GEC did not appear to have any positions available for Vargas, she asked the company to provide her with a termination letter so that she could apply for unemployment insurance benefits. Although GEC did not usually issue formal termination letters to employees who were temporarily idle, it agreed to Vargas' request and provided a termination letter dated January 30, 1997. *See* Haithcox Dep. at 85–86, 112–13 & Ex. 4.

GEC indicated in its letter that it considered Vargas an "excellent" employee and that it would "happily rehire her" if a position for which she was qualified opened up. *Id.* Ex. 4. GEC did offer Vargas the first field secretary position to open up (in December, 1997), but Vargas turned it down.

Although it is true that GEC did not have any "field secretary" positions available between January and early December, 1997, the company did have work available for which Vargas' typing skills would have been adequate. This is illustrated by the company's treatment of Katrina Huckleby, a field secretary hired by GEC in 1996 whose typing skills (60 correct words per minute) were nearly identical to Vargas'. As with Vargas, the project at which Huckleby was working ended in December 1996, but unlike Vargas GEC found her a variety of temporary positions—primarily data entry and secretarial assignments—that kept her gainfully employed until she decided to leave the company in September, 1997. Haithcox shoehorned Huckleby into these positions because he was under the impression that the president of GEC, Niranjan Shah, had guaranteed Huckleby permanent employment with the company during a conversation with her in December, 1996. Haithcox Aft. ¶¶ 21–22; Huckleby Dep. at 32. Shah apparently offered Huckleby this guarantee in order to deter her from interviewing with another company.

Since January, 1997, GEC has hired five people to perform secretariat functions. These hirings cast some doubt on the company's assertion that an ability to type 70 correct words per minute is a non-negotiable prerequisite for obtaining a secretarial position at company headquarters: two of the newly hired secretaries could not meet this standard. *See* Haithcox Aft. ¶¶ 31, 34 (indicating that Fahimeh Tabrizi and Adrienne Stephens could type only 67 and 68 words per minute, respectively).[3] There is no evi-

---

3. GEC tries to avoid this problem by submitting an affidavit from Haithcox suggesting that the actual requirement is "65–70 words per minute." Haithcox Aff. ¶ 20. This assertion differs from Haithcox's deposition testimony, which contains an unqualified assertion that the company requires 70 words per minute for headquarters secretaries. *See* Haithcox Dep. at 20. Even if this subtle change does not violate the general prohibition against using subsequent affidavits to contradict prior deposition testimony, *see Bank of Illinois v. Allied Signal Safety Restraint*, 75 F.3d 1162, 1168–70 (7th Cir.1996), it at least raises a genuine question as to whether GEC

dence that any applicant for a secretarial position besides Vargas has ever been rejected by GEC for inadequate typing speed.

## II. Discussion

Vargas contends that GEC's failure to re-employ her after she took her maternity leave violated both the FMLA and the PDA. We consider these claims separately.

### A. FMLA

The FMLA imposes two basic requirements on employers: (1) they must permit their employees to take a leave of absence of up to 12 weeks per year if such leave is requested for one of a specified list of reasons, which includes "the birth of a son or daughter of the employee," 29 U.S.C. § 2612(a)(1)(A); and (2) at the completion of the leave, the employer must restore the employee to his or her former position or to "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment," 29 U.S.C. § 2614(a)(1). Additionally, employers are not permitted to restrain employees from asserting their rights under the FMLA or to retaliate against them if they do so. *See* 29 U.S.C. § 2615.

Although Vargas' brief seems to characterize her FMLA claim as arising under the retaliation provision, *see* Pl.'s Resp. Br. at 6–7 & n.4, we think it is more properly viewed as an allegation that GEC failed to restore her to her former position (or an equivalent). The retaliation provision seeks to provide a cause of action against an employer who "discriminate[s] against [an] individual for opposing any practice made unlawful by [the FMLA]." 29 U.S.C. § 2615(a)(2). This situation is not present here. Until the filing of this lawsuit, Vargas never accused GEC of violating the FMLA: rather, it is clear that GEC complied with Vargas' FMLA request for maternity leave. Vargas' only complaint

with GEC's behavior is that it did not restore her to her former position (or an equivalent one) when her leave ended, an accusation which clearly falls under the rubric of § 2614.[4]

The question, therefore, is whether a jury could find that § 2614 required GEC either to restore Vargas to her old job as a field secretary or to reassign her to company headquarters. We believe the answer is yes. Although § 2614(a)(1) provides that employees who have taken leave are generally entitled to be restored to their old position or an equivalent one, this entitlement is limited by § 2614(a)(3)(B), which states: "Nothing in this section shall be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." In other words, an employer need not place an employee returning from leave in a better position than she would have been in had she not taken the leave. *See* 29 C.F.R. § 825.216(a) ("An employee has no greater right to reinstatement or to other benefits . . . than if the employee had been continuously employed during the FMLA leave period.").

It is uncontroverted that shortly after Vargas began her maternity leave, the State Street Project on which she had been working as a field secretary came to an end. It is also uncontested that GEC did not have any openings for field secretaries when Vargas sought to return from leave in January, 1997, nor did any such openings occur until December of that year. Thus, it is clear that even if Vargas had never had a baby or taken maternity leave her position as a field secretary would have been terminated, and she therefore had no right to be reinstated as a field secretary.

Vargas responds to this problem by arguing that GEC was obligated to offer her one

---

really had a clear and inflexible typing-speed requirement.

**4.** The question of which provision applies is more than a semantic matter. The Seventh Circuit has indicated that it is inappropriate to apply the *McDonnell Douglas* burden-shifting framework to "substantive" claims under the FMLA—that is, claims asserting an improper de-

nial of leave or an unjustified refusal to restore an employee to his or her former position after a leave. *See Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 713 (7th Cir.1997). *Diaz* expressly reserved the question of whether *McDonnell Douglas* would apply to an FMLA retaliation claim, however. *See id.*

of the secretarial positions at company headquarters because those jobs were equivalent to her position as a field secretary. This kind of argument is explicitly invited by the FMLA, see § 2614(a)(1)(B), but it obviously depends on the resolution of a factual question: is a GEC field secretary "equivalent" to a GEC headquarters secretary? The regulations promulgated by the Department of Labor pursuant to the FMLA set forth a two-part standard of equivalency: (1) the positions must be "virtually identical" with respect to "pay, benefits and working conditions, including privileges, perquisites and status"; and (2) the positions must be "substantially similar" in terms of "duties, responsibilities ... skill, effort, responsibility, and authority." 29 C.F.R. § 825.215(a).

The parties have provided almost no evidence regarding the pay, benefits, working conditions, privileges, perquisites, and status of the two jobs, but what little we have seems to indicate that they are indeed "virtually identical." See Huckleby Dep. at 30, 46–47 (indicating that Huckleby earned the same salary at GEC headquarters as she had in the field). GEC has some strong evidence that the skills and duties of field secretaries are not "substantially similar" to headquarters secretaries. Headquarters secretaries are required to type at faster speeds (though precisely how much faster is not clear, see supra note 3), and they perform some tasks that are not performed by field secretaries, such as preparing lengthy reports and interacting with clients. On the other hand, the fact that Katrina Huckleby—with no better typing skills than Vargas—was able to handle a variety of secretarial tasks at GEC headquarters is somewhat persuasive evidence that the two jobs are substantially similar in terms of skills requirements. Cf. Haithcox Dep. at 17 (indicating that the main way in which field secretaries are different is that "instead of working in the main office, they work on field sites").

If this were a bench trial to be decided on the paper record presently before us, we would find that the skills and duties of headquarters secretaries are not "substantially similar" to those of field secretaries, and therefore that the two positions are not "equivalent" for FMLA purposes. But that is not the posture of this case: we are deciding a summary judgment motion, and the question is whether a reasonable jury could conclude, on the evidence provided, that the two positions are equivalent. We believe that it could. If the positions are found to be equivalent, Vargas has a viable claim against GEC under § 2614(a)(1)(B). Accordingly, GEC's motion for summary judgment on the FMLA claim is denied.

## B. PDA

■ The PDA amended Title VII to clarify that pregnancy discrimination is included in Title VII's prohibition against discrimination on the basis of sex. See Ilhardt v. Sara Lee Corp., 118 F.3d 1151, 1154 (7th Cir.1997). Thus, "[a]n unlawful employment practice is established whenever pregnancy is a motivating factor for an adverse employment decision." Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 722 (7th Cir. 1998). Vargas has no direct evidence of discriminatory motive (i.e. an admission by a GEC representative of discriminatory intent), but she may avoid summary judgment either by presenting circumstantial evidence of discriminatory intent or by utilizing the familiar McDonnell Douglas burden-shifting framework to show that GEC's stated reason for refusing to re-hire her as a secretary after her maternity leave was pretextual. See id.; Ilhardt, 118 F.3d at 1154–56; Troupe v. May Dep't Stores Co., 20 F.3d 734, 736 (7th Cir.1994).

■ Regardless of whether we treat Vargas' PDA claim as one based on circumstantial evidence or as one brought under McDonnell Douglas, her hopes rest on the validity of her assertion that "similarly situated, non-pregnant employees received better treatment" than she did. Pl.'s Br. at 12.[5] The standard for establishing that two people are "similarly situated" is strict: Vargas must show that " 'she was treated less favorably than a nonpregnant employee under

---

5. The Seventh Circuit has acknowledged that this kind of circumstantial evidence alone "can create a triable issue of intentional discrimination" even if it is "not rigorously statistical," Troupe, 20 F.3d at 736, and at any rate it would be necessary for Vargas to make such a showing in

identical circumstances.' " *Id.* (quoting *Hunt–Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago,* 104 F.3d 1004, 1010 (7th Cir.1997)) (emphasis added). Vargas must therefore show that other similarly situated but non-pregnant field secretaries whose projects ended (or who took some sort of leave and returned to find no position available) were treated more favorably by GEC.

▮▮▮ Vargas understandably points to Katrina Huckleby as her prime "similarly situated but non-pregnant" example. The analogy to Huckleby has a fatal flaw, however: GEC had promised her permanent employment at the company. Thus Huckleby and Vargas were not similarly situated even leaving Vargas' pregnancy aside: one had a form of "tenure" while the other was an employee-at-will. Alternatively, Vargas suggests that she was similarly situated to the five headquarters secretaries GEC hired during 1997. At first glance this argument seems odd since Vargas was no longer pregnant in 1997 (having given birth in December, 1996): one might think that after giving birth she could no longer state a claim under something called the Pregnancy Discrimination Act.[6] The Seventh Circuit, however, has indicated that a PDA claim is properly alleged if an employer, upon learning of an employee's pregnancy (or her intent to take a maternity leave), sets out to treat her worse than other employees or prospective employees. *See Piraino v. International Orientation Resources, Inc.,* 84 F.3d 270, 274 (7th Cir.1996). We assume that is Vargas' theory of this case.

So the critical question is whether Vargas was similarly situated to the secretaries hired in 1997 aside from the fact of her pregnancy. The only difference GEC suggests is that Vargas could not type as fast as the other candidates. *See* Def.'s Reply Br. at 13–14. But although this claim is literally true, we do not think the dissimilarity is so clear as to warrant summary judgment: Vargas, at 61 words per minute, is only marginally slower than Fahimeh Tabrizi (67 words) and Adrienne Stephens (68 words). A jury could conclude that these three candidates are similarly situated in terms of typing skills.

GEC uses the typing speed issue to attack Vargas' PDA claim at two other points in the *McDonnell Douglas* analysis. First, GEC argues that because Vargas could not type 70 words per minute she was not qualified for a secretarial position at headquarters. This would be a strong argument if it was clear that 70 words per minute was in fact a prerequisite for the job, but that is not what the evidence shows. Looking at the evidence in the light most favorable to Vargas (as we must), GEC is willing to hire headquarters secretaries with typing speeds in the 60s, and has shown a willingness (in the case of Katrina Huckleby) to assign substantial headquarters secretarial work to employees who type slower than Vargas. Second, GEC argues that Vargas' inability to type 70 words per minute was a legitimate, non-discriminatory reason for its decision not to offer her a secretarial position at headquarters. But for the reasons already stated, we believe that Vargas has raised a genuine issue as to whether this reason was pretextual: if 70 words per minute were truly a prerequisite for the job, how could GEC hire Tabrizi and Stephens as secretaries and how was the company able to find temporary secretarial work for Huckleby? As long as these questions remain unanswered, summary judgment in favor of GEC on the PDA claim is inappropriate.

### III.  Conclusion

For the foregoing reasons, defendant's motion for summary judgment is denied. It is so ordered.

---

order to establish a *McDonnell Douglas* prima facie case, *see Ilhardt,* 118 F.3d at 1155 (stating that the fourth element of prima facie case of pregnancy discrimination is that "[s]imilarly situated employees not in the protected class were treated more favorably").

**6.** There is no suggestion that when Vargas sought to return from maternity leave she was suffering from lingering pregnancy-related medical conditions that might conceivably give her continued standing under 42 U.S.C. § 2000e(k) (which protects women "affected by pregnancy ... or related medical conditions").