Robert W. TUSZKIEWICZ, Plaintiff,

v.

ALLEN–BRADLEY COMPANY, INC., Defendant.

No. 96–C–110.

United States District Court, E.D. Wisconsin.

June 24, 1997.

As Corrected June 25, 1997.

Alan C. Olson, Alan C. Olson & Associates, New Berlin, WI, for Plaintiff.

Robert H. Duffy, Pamela M. Ploor, Quarles & Brady, Milwaukee, WI, for Defendant.

### DECISION AND ORDER

MYRON L. GORDON, District Judge.

Robert Tuszkiewicz alleges that his former employer, Allen–Bradley Company, Inc., terminated him because he suffers from symptoms of his hydrocephalus, not because, as Allen–Bradley claims, he was taking premiums from vendors in violation of Allen–Bradley's ethics practice and policy. Mr. Tuszkiewicz filed this action pursuant to the Americans With Disabilities Act of 1990, Pub.L. No. 101–336, 104 Stat. 327 (codified in scattered sections of 42 U.S.C. and 47 U.S.C.) ["ADA"]. Presently before the court is the defendant's motion for summary judgment, pursuant to Rule 56, Federal Rules of Civil Procedure.

### I. UNDISPUTED FACTUAL BACKGROUND

#### A. Responding to Proposed Findings of Fact

Pursuant to Local Rule 6.05(d), the court will conclude that there is no genuine issue as to any material fact to which a specific response has not been set forth. *Hartley v. Wisconsin Bell, Inc.,* 930 F.Supp. 349, 354 (E.D.Wis.1996); *see Stewart v. McGinnis,* 5 F.3d 1031, 1034 (7th Cir.1993), *cert. denied,*

510 U.S. 1121, 114 S.Ct. 1075, 127 L.Ed.2d 393 (1994). Local Rule 6.05(b)(1) states that the non-movant's response to the movant's proposed findings of fact should delineate "only those findings to which it is asserted that a genuine issue of material fact exists" and that the response must "cite evidentiary materials which support the claim that a dispute exists" (emphasis in original).

Along with its motion, the defendant submitted 118 proposed findings of fact. In his response, Mr. Tuszkiewicz does specifically address each one, but he often fails to take issue with the facts or to set forth support for his own version of the facts. Instead, the plaintiff has presented additional facts that are related, but not contrary to, the defendant's proposed facts, or he has simply challenged a fact based on a particular witness' credibility, without citing anything else in the record to support his contention that there is a factual dispute. Thus, many of the defendant's proposed findings of fact must be taken as true for purposes of this summary judgment motion.

For example, one of defendant's proposed findings of fact stated that "From October 31, 1994, until November 7, 1995, Allen–Bradley paid 100% (including Tuszkiewicz's portion) of his health insurance premium.... For the first 20 weeks of his leave, Allen–Bradley paid Tuszkiewicz 100% of his salary. Thereafter, Allen–Bradley paid Tuszkiewicz $350 per week until he was on leave for one-half year." (Defendant's Proposed Findings of Fact ["DPFF"] ¶ 30). In response, the plaintiff merely stated: "All disability benefits paid to Tuszkiewicz because of his Hydrocephalus were pursuant to Allen Bradley's normal policies." (Plaintiff's Response to Defendant's Proposed Findings of Fact ["PR"] ¶ 30). While the plaintiff's statement may very well be true, it is nonresponsive to the defendant's proposed finding.

Similarly, Mr. Tuszkiewicz often challenges a proposed finding of fact by stating that the proposed finding is not supported by the evidence, often because the witness upon whose deposition or affidavit the defendant relies, is not credible. Instead of pointing the court to evidence in the record that would show a dispute or at least pointing to a

lack of support for the defendant's proposed finding, Mr. Tuszkiewicz merely cites a portion of the particular witness' deposition or affidavit that calls his or her credibility into dispute, but that does not call that particular fact into dispute. This kind of response is not sufficient for the court to find that a genuine issue exists.

## B. Findings of Fact

The following undisputed facts are taken from the parties' proposed findings of fact. This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and venue is proper pursuant to 28 U.S.C. § 1391. (DPFF ¶¶ 1–2; PR ¶¶ 1–2). Mr. Tuszkiewicz was an employee of Allen–Bradley, and his last position with the company was Supervisor of Custom Publications. (DPFF ¶ 4; PR ¶ 4; Plaintiff's Proposed Findings of Fact ["PPFF"] ¶ 4; Defendant's Response to Plaintiff's Proposed Findings of Fact ["DR"] ¶ 4). Allen–Bradley designs, manufactures, and supports a broad range of control and automation products worldwide. (DPFF ¶ 3; PR ¶ 3). Mr. Tuszkiewicz's duties included producing customer technical publications, producing assigned standard publications, selecting, hiring, training, motivating, supervising and promoting staff, organizing, maintaining, and ensuring the integrity of the custom publication job folder, budgeting and forecasting assigned activities, and coordinating the work of outside suppliers using standard purchasing practices. (DPFF ¶ 19; PR ¶ 19).

In 1963, Mr. Tuszkiewicz underwent a medical brain shunt procedure known as a craniotomy in order to treat hydrocephalus, a disease which, in Mr. Tuszkiewicz, is caused by a blockage in between the third and fourth ventricles of the brain. (PPFF ¶¶ 1, 34; DR ¶¶ 1, 34; DPFF ¶ 28; PR ¶ 28). This surgery is performed to alleviate pressure on the brain caused by the buildup of spinal fluid. (PPFF ¶ 32; DR ¶ 32). An individual with hydrocephalus is never cured. A functioning shunt only alleviates the symptoms. (PPFF ¶ 33; DR ¶ 33).

During his employment with Allen–Bradley, Mr. Tuszkiewicz was given a series of pay raises and promotions. He was "cost conscious" in his job and performed his job

"competently." (PPFF ¶ 3; DR ¶ 3). In April, 1994, Mr. Tuszkiewicz began to experience memory loss, headaches, vomiting, and other symptoms of his hydrocephalus. (PPFF ¶ 16; DR ¶ 16; DPFF ¶ 22; PR ¶ 22). In October, 1994, Mr. Tuszkiewicz was forgetting how to turn on his computer, repeating his instructions and questions to coworkers, and was unable to concentrate. He was irritable, confused, had headaches, and generally diminished cognitive functioning. (PPFF ¶ 20; DR ¶ 20).

From June through August 1994, Scott Patterson, Mr. Tuszkiewicz's supervisor, began to notice problems in Mr. Tuszkiewicz's job performance. (DPFF ¶ 18; PR ¶ 18). Mr. Tuszkiewicz told Mr. Patterson and other Allen–Bradley employees that he was having difficulty performing his job. (PPFF ¶ 17; DR ¶ 17). Specifically, the plaintiff told Mr. Patterson that he was having problems with his memory, that he was repeating things, and that he was asking the same questions over and over. (PPFF ¶ 19; DR ¶ 19). In September, 1994, Mr. Tuszkiewicz told Mr. Patterson that he felt confused and overwhelmed about how to perform his job. Mr. Patterson noticed that the plaintiff had difficulty remembering instructions. (DPFF ¶ 21; PR ¶ 21). On October 4, 1994, Mr. Tuszkiewicz told Mr. Patterson that he felt overwhelmed and depressed and that he was interested in seeking help through the defendant's employee assistance program ["EAP"]. Mr. Patterson assured Mr. Tuszkiewicz that that was a good start. (DPFF ¶ 23; PR ¶ 23).

On October 11, 1994, Mr. Patterson wrote in Mr. Tuszkiewicz's progress notes: "Bob is still having difficulty remembering simple instructions." (PPFF ¶ 22; DR ¶ 22). On October 18, 1994, Mr. Tuszkiewicz and Mr. Patterson again discussed the plaintiff's situation; Mr. Tuszkiewicz said that he still had headaches and difficulty concentrating. Mr. Patterson suggested that Mr. Tuszkiewicz continue to investigate his symptoms with his medical doctor, chiropractor, and the EAP. (DPFF ¶ 24; PR ¶ 24; PPFF ¶ 23; DR ¶ 23).

In October, 1994, Dr. Joy Myers, a psychotherapist, did an assessment on Mr. Tusz-

kiewicz though the defendant's EAP. (DPFF ¶ 26; PR ¶ 26). The plaintiff complained to Dr. Myers about his memory problems and his problems functioning at work. (PPFF ¶ 25; DR ¶ 25). Dr. Myers concluded that Mr. Tuszkiewicz had diminished cognitive functioning and very poor memory. (PPFF ¶ 26; DR ¶ 26). During her second session with Mr. Tuszkiewicz, Dr. Myers found that the plaintiff was even more disoriented. She recommended that he see his dentist and his physician. (PPFF ¶ 27; DP ¶ 27).

On or about October 31, 1994, Mr. Tuszkiewicz submitted a doctor's note stating that he was unable to return to work until further notice because he was being evaluated for the possible medical cause of his short term memory loss. (DPFF ¶ 27; PR ¶ 27). On November 7, 1994, Dr. Jack Deckard, a neurosurgeon, determined that Mr. Tuszkiewicz was suffering from increasing headaches, memory disturbances, two episodes of bowel incontinence, and enlarged ventricles. (PPFF ¶ 29; DP ¶ 29). Dr. Deckard diagnosed Mr. Tuszkiewicz with a malfunctioning shunt in his brain. (DPFF ¶ 28; PR ¶ 28). Over the next year, Mr. Tuszkiewicz underwent three surgeries to implant a working shunt. (DPFF ¶ 28; PR ¶ 28; PPFF ¶ 30; DR ¶ 30). Allen–Bradley paid 100% of Mr. Tuszkiewicz's health insurance premium from October 31, 1994 until November 7, 1995. For the first 20 weeks of Mr. Tuszkiewicz's leave, Allen–Bradley paid 100% of Mr. Tuszkiewicz's salary. After that, Allen Bradley paid him $350 per week until Mr. Tuszkiewicz had been on leave for half of a year. (DPFF ¶ 30; PR ¶ 30). When Mr. Tuszkiewicz indicated that he would not return to work after his short term disability expired in June, 1995, Allen–Bradley retained Chiron, a medical assessment company, to act as a case manager to ensure that Mr. Tuszkiewicz was getting proper care. (DPFF ¶ 31; PR ¶ 31).

The Mequon facility of Allen–Bradley communicated its ethics policies and practices to its employees through training programs. (DPFF ¶ 10; PR ¶ 10). The training program included formal in-class training for two to three hour sessions. (DPFF ¶ 10; PR ¶ 10). During the training sessions, the em-

ployment and training manager discussed the Mequon facility's practice that employees not accept anything of greater than nominal value. (DPFF ¶ 11; PR ¶ 11). During the training, the manager handed out booklets entitled "Ethics is Good Business." She instructed employees to read and understand the booklet and to return a signed card verifying that they read and understood its contents. (DPFF ¶ 13; PR ¶ 13). Mr. Tuszkiewicz attended one of these ethics training sessions, and he signed a statement saying that he read and understood the booklet. (DPFF ¶ 14–15; PR ¶ 14–15). The "Ethics is Good Business" booklet stated the following:

Q: Some companies set a dollar limit on the value of a gift that an employee may accept. Does Rockwell have such a limit?

A: Rockwell is a diverse company serving different government and commercial markets. Each company business is most familiar with the customs, practices, and restrictions that govern the specific markets that it serves. Therefore, most company businesses have established rules that govern what their employees may accept as business gifts. You should check to see what rules apply at your location.

If your business has not established any other rule, company policy permits employees to accept gifts of modest value, consistent with generally accepted, ethical, and legal business practices. The value of such gifts, however, may not exceed $100 in any year from any source. Each business may establish more restrictive rules for its employees.

(DPFF ¶ 7; PR ¶ 7).

While Mr. Tuszkiewicz was on medical leave, Mr. Patterson discovered a September 22, 1993 purchase order to MicroWarehouse that requested two items, listed by number, at no charge. (DPFF ¶ 33; PR ¶ 33). Mr. Patterson also saw an invoice, initialed by Mr. Tuszkiewicz, that indicated that the order was shipped to him. The invoice identified the items as a portable AM/FM cassette stereo premium and a Casio portable color TV premium. (DPFF ¶ 33; PR ¶ 33). Mr. Patterson also discovered a January 4, 1994 invoice from MicroWarehouse that showed that Mr. Tuszkiewicz ordered the same two items again. (DPFF ¶ 34; PR ¶ 34). The invoice indicated that the order was shipped to Mr. Tuszkiewicz's attention and that he approved the invoice for payment. (DPFF ¶ 34; PR ¶ 34). Mr. Patterson discovered a similar invoice, dated January 24, 1994, that indicated that Mr. Tuszkiewicz placed another order for the same two items. Mr. Tuszkiewicz wrote "OK" on the invoice and initialed it. (DPFF ¶ 35; PR ¶ 35). Mr. Patterson contacted MicroWarehouse on November 21, 1994 and confirmed that it shipped the premiums. (DPFF ¶ 36; PR ¶ 36). Mr. Patterson looked for the stereos and television sets in the department, but did not find them. (DPFF ¶ 37; PR ¶ 37).

On November 29, 1994, Mr. Patterson approached his supervisor, Jim King, Commercial Marketing Manager, about what he had discovered. He had prepared a memorandum that outlined his discovery of the documentation. (DPFF ¶ 38; PR ¶ 38). After he prepared this memorandum, Mr. Patterson discovered other purchasing documentation reflecting additional premiums including First Alert timers, Audubon calendars, a clock radio, and a cookbook, accepted by Mr. Tuszkiewicz. (DPFF ¶ 39; PR ¶ 39). This documentation included purchase orders requesting the no charge items and invoices. (DPFF ¶¶ 40–44; PR ¶¶ 40–44).

Shortly after he prepared his November 29 memorandum, Mr. Patterson met with Jim King and Jeffrey Kubik, Human Resources Manager for the Standard Drives division, to discuss Mr. Tuszkiewicz's alleged acceptance of premiums. (DPFF ¶ 45; PR ¶ 45). Mr. Patterson described how he found the documents that he believed to show a violation of the ethics practice and policy and explained his November 29 memorandum. (DPFF ¶ 45; PR ¶ 45). Mr. Patterson also showed Mr. Kubik the additional documentation that he had discovered. (DPFF ¶ 45; PR ¶ 45). Mr. Kubik reviewed the findings and the documents, and he asked questions about the documentation to determine what information they conveyed. (DPFF ¶ 46; PR ¶ 46).

Mr. Kubik then asked Mr. Patterson for additional documentation to establish a chain of custody of the orders. He also asked Mr. Patterson to obtain Allen–Bradley purchase requisitions. (DPFF ¶ 47; PR ¶ 47).

Mr. Patterson discovered two sets of the purchase requisitions, prepared in Mr. Tuszkiewicz's handwriting, for the television and the stereo, dated September 13, 1993 and January 5, 1994. (DPFF ¶ 48–49; PR ¶ 48–49). He also found a requisition prepared by Mr. Tuszkiewicz for a free cookbook, (DPFF ¶ 50; PR ¶ 50), dated April 3, 1991, a requisition prepared by Mr. Tuszkiewicz for a free clock radio, dated February 11, 1992, (DPFF ¶ 51; PR ¶ 51), a requisition prepared by Mr. Tuszkiewicz for a free Audubon calendar, dated November 4, 1992, (DPFF ¶ 52; PR ¶ 52), and three requisitions prepared by Mr. Tuszkiewicz for free First Alert lighting timers, dated September 9, 1993, March 11, 1994, and March 21, 1994, (DPFF ¶¶ 53–55; PR ¶¶ 53–55).

In approximately late December, 1994 or early January, 1995, Mr. Kubik and Mr. Patterson met again. (DPFF ¶ 56; PR ¶ 56). They reviewed the purchase requisitions, purchase orders, vendor shipping invoices, and Mr. Patterson's notes. They discussed the premiums that Mr. Tuszkiewicz had accepted, and Mr. Patterson reported the vendors' description of the premiums. (DPFF ¶ 56; PR ¶ 56).

From September, 1993 through January, 1994, Mr. Tuszkiewicz ordered and received three Casio televisions from MicroWarehouse. The suggested retail price of the televisions was in the range of $129—$150. (DPFF ¶¶ 103–104; PR ¶¶ 103–104). During that same time period, Mr. Tuszkiewicz ordered and received three cassette stereos. (DPFF ¶ 106; PR ¶ 106). In 1993 and 1994, Mr. Tuszkiewicz ordered and received three First Alert timers from Xerox. The suggested retail price of each timer was approximately $9.02. (DPFF ¶¶ 110–111; PR ¶¶ 110–111).

All of the items sent to Mr. Tuszkiewicz's department were given to charity, often times charities that were sponsored by Allen–Bradley. (PPFF ¶ 9; DR ¶ 9). Mr. Tuszkiewicz dropped the premium items off at Family Sharing, St. Vincent DePaul, and St. Paul's Church in Grafton, Wisconsin. (PPFF ¶ 14; DR ¶ 14). Mr. Tuszkiewicz had been giving personal items to charities and needy children for many years. (PPFF ¶ 15; DR ¶ 15).

Allen–Bradley reorganized the Standard Drives business on March 17, 1995. As a result, human resources responsibility for Standard Drives personnel, including Mr. Tuszkiewicz, transferred from Mr. Kubik to Nadine Nagel, Vice President of Human Resources at Mequon Allen–Bradley. (DPFF ¶ 58; PR ¶ 58). On May 4, 1995, Mr. Kubik talked with Ms. Nagel to fill her in on the investigation into Mr. Tuszkiewicz's potential ethics violations. Mr. Kubik told Ms. Nagel that Mr. Patterson and Mr. King were involved in the investigation and had relevant documentation. Ms. Nagel was aware that the allegations against Mr. Tuszkiewicz were that he accepted gifts of greater than nominal value on several occasions. (DPFF ¶ 60; PR ¶ 60).

Ms. Nagel then told Jo Ann Adams, Human Resources Manager for Allen–Bradley Mequon that she would be responsible for carrying out or being involved in the decision to discharge Mr. Tuszkiewicz. Ms. Nagel told Ms. Adams to continue following up on when Mr. Tuszkiewicz would return from his medical leave and to make sure that all the documentation had been reviewed before meeting with him. Ms. Nagel also told Ms. Adams to further investigate the alleged ethics violations by Mr. Tuszkiewicz using her own discretion. (DPFF ¶ 61; PR ¶ 61). Ms. Nagel reviewed the purchase requisitions and orders completed by Mr. Tuszkiewicz. (DPFF ¶ 62; PR ¶ 62). Ms. Adams asked Mr. Patterson to investigate whether any of Mr. Tuszkiewicz's co-workers received premiums from vendors. Mr. Patterson determined that other employees had accepted mugs, which did not violate the ethics policy. (DPFF ¶ 65; PR ¶ 65).

It was decided that Mr. Tuszkiewicz would be given an opportunity to dispel any information that had been found in the investigation, but absent his denying the information, he would be discharged upon his return for

violation of the ethics policy. (DPFF ¶ 63; PR ¶ 63). The decision to discharge Mr. Tuszkiewicz had been made before May, 1995; the decision was made during December, 1994. (PPFF ¶¶ 39, 42; DR ¶¶ 39, 42). In May, 1995, Allen–Bradley packed Mr. Tuszkiewicz's personal belongings into boxes, disabled his identification badge, and changed his computer passwords. (PPFF ¶ 44; DR ¶ 44). Despite the discovery of Mr. Tuszkiewicz's apparent ethics violations in November, 1994, Allen–Bradley did not raise its concerns with Mr. Tuszkiewicz until he returned to work from his medical leave. The Mequon facility has a practice of not terminating an employee while he or she is out on medical leave. The reason for the practice is so that Allen–Bradley does not interfere with the employee's recovery from illness. (DPFF ¶ 59; PR ¶ 59).

Allen–Bradley did not determine the value of the premiums that Mr. Tuszkiewicz had given to charity. (PPFF ¶ 112; DR ¶ 112). Ms. Adams and Mr. Patterson, before discharging Mr. Tuszkiewicz, did not determine whether the premiums had been donated within one year, or over a period of years. (PPFF ¶ 114; DR ¶ 114). Allen–Bradley did not determine whether the free items influenced Mr. Tuszkiewicz's buying decisions in any way or whether his donation of items affected the product received by Allen–Bradley or the price paid by Allen–Bradley for products. (PPFF ¶¶ 116, 117; DR ¶¶ 116, 117).

On February 27, 1995, Mr. Tuszkiewicz reported to his neurosurgeon, Dr. Jack Deckard, that he felt his memory had probably returned to normal, and in his examination of the plaintiff, Dr. Deckard found nothing inconsistent with Mr. Tuszkiewicz's report. (DPFF ¶ 66; PR ¶ 66). A CT scan on April 24, 1995, revealed that Mr. Tuszkiewicz's ventricles were within normal limits. (DPFF ¶ 67; PR ¶ 67). The plaintiff and his wife reported to Dr. Deckard on May 1, 1995 that they felt that he had made a near total recovery concerning intellectual functioning, and Dr. Deckard observed nothing inconsistent with this report. (DPFF ¶ 68; PR ¶ 68).

Dr. Mark Pushkash, Ph.D., performed neuropsychological testing on Mr. Tuszkiewicz on June 6, 1995. He found no evidence of cognitive defects, concluded that Mr. Tuszkiewicz's intelligence was within the average range, and determined that the plaintiff showed no indications of attention concentration problems, memory impairment, sensory loss, or problems with logic, reasoning, or judgment. (DPFF ¶ 69; PR ¶ 69).

On September 13, 1995, Mr. Tuszkiewicz's neurologist, Dr. Kurlanzik, evaluated Mr. Tuszkiewicz's EEG and concluded that it was normal; he also concluded that Mr. Tuszkiewicz's hydrocephalus was under control. (DPFF ¶ 72; PR ¶ 72). Dr. Kurlanzik concluded, on October 20, 1995, that Mr. Tuszkiewicz could return to work, and he informed Dr. Deckard of this conclusion. (DPFF ¶ 73; PR ¶ 73). On October 20, 1995, Dr. Deckard prepared a return to work letter for Mr. Tuszkiewicz that said: "Mr. Tuszkiewicz's condition is such that I feel he will be able to return to work without restrictions on Tuesday, November 7, 1995, eight hours a day. He will return to see me in follow up in one year." (DPFF ¶ 74; PR ¶ 74; PPFF ¶ 47; DR ¶ 47). When Dr. Deckard released Mr. Tuszkiewicz to return to work, he observed nothing to suggest that Mr. Tuszkiewicz was not able to take care of himself or to perform the daily aspects of living, such as walking, speaking, breathing, performing manual tasks, seeing, hearing, caring for himself, standing, lifting, or reading. (DPFF ¶ 75; PR ¶ 75). Dr. Deckard was never asked by Allen–Bradley to provide information that would assist in making accommodations for Mr. Tuszkiewicz's handicap. (PPFF ¶ 53; DR ¶ 53).

In late October, 1995, Mr. Tuszkiewicz called Ms. Nagel's assistant and told her that he would be returning to work on November 7, 1995. (DPFF ¶ 76; PR ¶ 76). Mr. Tuszkiewicz sought the help of Dr. Joy Myers prior to his return to Allen–Bradley; he contacted her concerning his continued problems with concentration and other day-to-day tasks. (PPFF ¶¶ 59, 61; DR ¶¶ 59, 61). Mr. Tuszkiewicz asked Dr. Myers to request to accompany him to his back to work meeting. (PPFF ¶ 62; DR ¶ 62). Dr. Myers never

reviewed Mr. Tuszkiewicz's medical file, and never spoke to any of Mr. Tuszkiewicz's physicians after he started his series of surgeries. (DPFF ¶ 82; PR ¶ 82). Furthermore, she never performed neuropsychological tests on him, and did not open a case file for him because he never became her patient. (DPFF ¶ 82; PR ¶ 82).

On November 2, 1995, Dr. Myers contacted Tom Schwartz, Manager of Compensation and Benefits at Mequon Allen–Bradley. (DPFF ¶ 81; PR ¶ 81). She told Mr. Schwartz that she wanted to arrange a back to work conference because Mr. Tuszkiewicz had concerns about whether he could do his job. Mr. Schwartz told Dr. Myers that she did not need to accompany Mr. Tuszkiewicz to work on his return date. (DPFF 1 83; PR 1 83). Dr. Myers did not tell Mr. Schwartz that Mr. Tuszkiewicz needed to return on a trial basis, that his cognitive functioning needed to be reassessed after he started work, or that she was evaluating his ability to concentrate. (DPFF ¶ 84; PR ¶ 84).

Mr. Schwartz knew that it would have been beneficial for Mr. Tuszkiewicz's doctor to explain to Allen–Bradley management what his limitations were. (PPFF ¶ 67; DR ¶ 67). Before he received Dr. Myers' call, Mr. Schwartz knew that Mr. Tuszkiewicz was on medical leave for his hydrocephalus and that the condition caused dizziness, headaches, and loss of memory. (PPFF ¶ 75; DR ¶ 75). Furthermore, Mr. Schwartz knew that the medical assessment information that he received from Chiron, a medical assessment company hired by Allen–Bradley, would be used to determine what accommodations, if any, would be necessary for Mr. Tuszkiewicz. (PPFF ¶ 77; DR ¶ 77). Mr. Schwartz weekly reviewed the Chiron reports regarding Mr. Tuszkiewicz's medical condition. (PPFF ¶ 78; DR ¶ 78). Allen–Bradley did not receive Chiron's final report until after November 7, 1995. (PPFF ¶ 80; DR ¶ 80).

Had Dr. Myers been allowed to meet with Allen–Bradley representatives, she intended to discuss Mr. Tuszkiewicz's concerns about not being able to perform as well as he once had and how to look for failing capabilities and certain symptoms. (PPFF ¶ 70; DR ¶ 70).

As accommodations, Mr. Tuszkiewicz wanted Allen–Bradley to evaluate his work during his first week to decide what would be necessary given his difficulty with comprehension, concentrating, and working on the computer. (PPFF ¶ 107; DR ¶ 107).

Mr. Tuszkiewicz returned to work on November 7, 1995, and he met with Mr. Patterson and Ms. Adams at approximately 7:45 a.m. (PPFF ¶ 82; DR ¶ 82). Mr. Tuszkiewicz told Ms. Adams that "I'm glad that you're here because I have a lot of things to talk to you about, the things that I feel you should be watching because of my hydrocephalus." (PPFF ¶ 84; DR ¶ 84). Ms. Adams only "snickered" in response. (PPFF ¶ 85; DR ¶ 85). Before the meeting, Ms. Adams was unaware that Mr. Tuszkiewicz had any memory problems. She had not reviewed his medical history or spoken with anyone about his medical history. (PPFF ¶ 87; DR ¶ 87).

Ms. Adams gave the documentation regarding the acceptance of premiums that Mr. Patterson had obtained to Mr. Tuszkiewicz and asked him to explain it. (DPFF ¶ 88; PR ¶ 88). Mr. Tuszkiewicz stated that he did not remember taking the premiums, but that he may have taken them. (DPFF ¶ 90; PR ¶ 90). Ms. Adams reminded Mr. Tuszkiewicz of the ethics policy and told him that accepting gifts from a vendor was very serious and could result in immediate discharge. She showed him that he had signed an ethics training card stating that he understood the consequences of his actions. (DPFF ¶ 91; PR ¶ 91). Ms. Adams again asked Mr. Tuszkiewicz to explain the invoices and told him that Allen–Bradley had evidence that he received these premiums. (DPFF ¶ 92; PR ¶ 92). Mr. Tuszkiewicz never told Ms. Adams or Mr. Patterson that he gave the premiums to charity. After his termination, he never called Allen–Bradley to say that he donated the premiums to charity. (DPFF ¶ 99; PR ¶ 99). Mr. Tuszkiewicz did not dispute the value of the premiums at the meeting. (DPFF ¶ 97; PR ¶ 97). Neither Ms. Adams nor Mr. Patterson provided Mr. Tuszkiewicz with a copy of the ethics policy. (PPFF ¶ 122; DR ¶ 122). Mr. Patterson

understood that Allen–Bradley did not prohibit receipt of gifts valued at less than $100. (PPFF ¶ 137; DR ¶ 137). Ms. Adams did not tell Mr. Tuszkiewicz that he would need to prove that each item was valued at less than $100. (PPFF ¶ 123; DR ¶ 123).

At the conclusion of the meeting, Ms. Adams told the plaintiff that because Allen–Bradley had evidence of his receiving the premiums from vendors, he was terminated. (DPFF ¶ 93; PR ¶ 93). She gave him the Standards of Conduct exit interview form. He checked "No" to the question, "Do you have any knowledge of any activity that may be in violation of Allen–Bradley's policies regarding statements of business conduct that has not been previously reported." (DPFF ¶ 94; PR ¶ 94).

During the meeting, Mr. Patterson believed that Mr. Tuszkiewicz was completely recovered based on his return to work letter from Dr. Deckard on his appearing on time, properly dressed, acting like himself, remembering persons, and asking specific questions about them. (DPFF ¶ 100; PR ¶ 100). Mr. Tuszkiewicz had also looked and dressed normally on October 11, 1994, the day that Mr. Patterson had documented Mr. Tuszkiewicz's abnormal functioning. (PPFF ¶ 92; DR ¶ 92).

After Mr. Tuszkiewicz's discharge, Mr. Patterson helped Mr. Tuszkiewicz take his belongings to his car. (DPFF ¶ 95; PR ¶ 95). Mr. Tuszkiewicz made no attempt to justify or explain his actions, and he never told Mr. Patterson that he had given the items to charity. (DPFF ¶ 96; PR ¶ 96).

Mr. Patterson immediately documented the meeting with the following statement: "Bob implies (because of his illness) 'he can't remember things he learned in school.' " (PPFF ¶ 91; DR ¶ 91). Ms. Nagel never concluded, nor was she told, that Mr. Tuszkiewicz's disclosure of memory problems during the discharge meeting was inaccurate. (PPFF ¶ 98; DR ¶ 98).

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment will be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure. Only disputes over facts that are outcome determinative under the applicable substantive law are considered to be material and will preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir.1997).

The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 795 (7th Cir.1997). If the movant makes such a demonstration, the non-movant must go beyond the pleadings and set forth specific facts that show that there is a genuine issue for trial. Rule 56(e), Federal Rules of Civil Procedure; *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In resolving the motion, the court must view the record, and any reasonable inferences drawn therefrom, in the light most favorable to the non-moving party. *Griffin v. City of Milwaukee*, 74 F.3d 824, 826–27 (7th Cir.1996).

Questions of intent and credibility are often dispositive in an employment discrimination action. The court must therefore be careful not to step in the shoes of the factfinder by resolving swearing matches. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir.1997). This does not mean, however, that the movant must meet a higher summary judgment standard. Instead, the court should apply "added rigor," meaning that "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Collier v. Budd Co.*, 66 F.3d 886, 892 (7th Cir.1995). Employment discrimination cases, though, do "remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts." *Giannopoulos*, 109 F.3d at 410.

## III. ANALYSIS

In his complaint, filed on January 30, 1996, Mr. Tuszkiewicz asserts one broad claims for relief. He states that, because of his handicap, the defendant intentionally discriminated against him in violation of the ADA. This discrimination, the complaint alleges, caused him to lose wages, benefits, expenses, insurance, and advancement opportunities. (Compl.¶ 14). As the case has progressed, however, Mr. Tuszkiewicz's seems to have narrowed his broad claim into two claims under the ADA: one for disparate treatment and one for a failure to accommodate. (Pl. Pretrial Report at p. 3). I will address each claim separately.

### A. Discriminatory Discharge

■ The plaintiff alleges that Allen–Bradley fired him because of his disability, not because he allegedly accepted premiums in violation of the defendant's ethics policy and practice. The ADA prohibits an employer from discriminating against "a qualified individual with a disability because of the disability of such individual ... in regard to discharge of employees." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is someone who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

Because there is no direct evidence of discrimination, the court must undergo the now-familiar burden-shifting analysis first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), in order to determine whether Mr. Tuszkiewicz's disparate treatment claim can survive Allen–Bradley's motion for summary judgment. Although the *McDonnell Douglas* court articulated the burden-shifting framework for Title VII employment discrimination cases, the court of appeals for the seventh circuit has held that the framework also applies to discrimination claims under the ADA. *Leffel v. Valley Fin. Serv.*, 113 F.3d 787, 792–93 (7th Cir. 1997); *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir.1995). Mr. Tuszkiewicz must therefore first meet his initial burden of proving a prima facie case of discrimination. Allen–Bradley then must articulate a legitimate, non-discriminatory reason for discharging him. If the defendant does so, Mr. Tuszkiewicz must establish that Allen–Bradley's articulated reason is really just a pretext for discrimination. *Leffel*, 113 F.3d 787, at 792–93.

In order to prove his prima facie case, Mr. Tuszkiewicz must show (1) that he is disabled within the meaning of the ADA; (2) that his work performance met the employer's legitimate job expectations; (3) that he was discharged; and (4) that the circumstances surrounding his termination indicate that it is more likely than not that his disability was the reason for these adverse actions. *Leffel*, 113 F.3d 787, at 793–94; *DeLuca*, 53 F.3d at 797.

In both his proposed findings of fact and his brief in opposition to the defendant's motion, Mr. Tuszkiewicz alleges that Allen–Bradley decided to terminate Mr. Tuszkiewicz in December, 1994, long before he returned from his medical leave. Allen–Bradley, for purposes of its motion, does not dispute this allegation. (DR ¶¶ 39, 42). Relying on this undisputed fact, Allen–Bradley's first argument is that Mr. Tuszkiewicz cannot satisfy the first prong of the prima facie case because he was not a "qualified individual with a disability" at the time that Allen–Bradley made the adverse employment decision. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir.1996) ("The determination as to whether an individual is a 'qualified individual with a disability' must be made as of the time of the employment decision.").

It is Mr. Tuszkiewicz's burden to show that he was a qualified individual with a disability. *Bombard*, 92 F.3d at 563. In order to do so, he must make two showings: that he satisfied the prerequisites for the position and that he could perform the essential functions of the job, with or without reasonable accommodations. *Bombard*, 92 F.3d at 563. Al-

len–Bradley argues that because Mr. Tuszkiewicz has not provided the court with any evidence that he could perform the essential functions of the job in December, 1994, his claim must fail.

Despite the plaintiff's repeated assertions that Allen–Bradley decided to fire Mr. Tuszkiewicz in December, 1994, he offers the court nothing to show that he, despite being on medical leave at the time of the adverse decision and despite just having had his second of three surgeries, was able to perform any functions, much less essential functions, of his job. In fact, the only evidence that the plaintiff submits shows that, with or without accommodation, he could not have performed his job in December, 1994. At the time of Allen–Bradley's decision to fire Mr. Tuszkiewicz, he was on short term disability leave. Six months after the decision, Mr. Tuszkiewicz applied for long term disability. In his application, dated June 25, 1995, he stated that he was "unable to work" because of "decreased mentation" and "personality changes." Dr. Deckard, in the physician's statement of the disability application, when asked what Mr. Tuszkiewicz should not and cannot do, simply answered "job description." (Deckard Depo. Ex. 4).

Mr. Tuszkiewicz has simply not met his burden of showing that at the time of the adverse employment action, which he alleges, and the defendant concedes, took place in December, 1994, he was a qualified individual under the ADA. In an analogous case, the court of appeals for the seventh circuit held that because the plaintiff "failed to produce sufficient evidence to establish a genuine issue of material fact as to his ability to perform the essential functions of his job with reasonable accommodation" and because in the plaintiff's deposition, he stated that he was "unable to work" during the relevant time, summary judgment against his claim under the ADA was proper. *Bombard,* 92 F.3d at 564; *see also Weiler v. Household Fin. Corp.,* 101 F.3d 519, 525 (7th Cir.1996) (holding that the ADA plaintiff was unable to perform essential functions of job when the plaintiff's psychotherapist had told the employer that the plaintiff was unable to work in any position, when the plaintiff did not

disagree with that point, and when the plaintiff, in response to a request for admission, conceded that she was "no longer able to work"); *Lewis v. Zilog, Inc.,* 908 F.Supp. 931, 946 (N.D.Ga.1995) ("Plaintiff's claiming that she is unable to work and receipt of long-term disability benefits also shows that Plaintiff cannot perform the essential functions of her job. Numerous cases have held that a plaintiff with a total disability or with numerous sporadic absences cannot perform the essential functions of her job because she cannot show that she can maintain a regular and reliable level of attendance at her job."); *Hendry v. GTE North, Inc.,* 896 F.Supp. 816, 825 (N.D.Ind.1995) ("[R]egular attendance at work is an essential function of virtually all jobs.").

■ Even if the plaintiff had alleged that the adverse employment action took place on November 7, 1995, when Allen–Bradley officially terminated Mr. Tuszkiewicz, his claim would fail. Mr. Tuszkiewicz did not meet his burden of showing that he could perform the essential functions of his job at that time. The plaintiff only makes this broad statement in his opposition brief: "Upon his return from medical leave on November 7, 1995, Tuszkiewicz may also have been able to perform the essential functions of the job with a reasonable accommodation." (Pl's Brief in Opposition to Def's Mot. for Summary Judgment p. 28). The plaintiff, however, in his concerted effort to show that he was still disabled at the time he returned to work, neglects to provide the court with any evidence, as required by *Bombard,* 92 F.3d at 563, that he could perform the essential job functions. *See Matney v. County of Kenosha,* 86 F.3d 692, 695 (7th Cir.1996) ("[T]he non-moving party must come forward with evidence to show the existence of each element of its case on which it will bear the burden at trial.").

For example, he alleges, in his proposed findings of fact, that Dr. Deckard was not comfortable that Mr. Tuszkiewicz would be able to return to work on a full-time scale without having problems, that a neuropsychological report dated June 6, 1995 revealed that Mr. Tuszkiewicz had "intellectual dysfunction," and that Dr. Deckard thought that

Mr. Tuszkiewicz would have difficulty performing his technical job at Allen–Bradley given his diminished cognitive functioning. (PPFF ¶¶ 49, 51, 55, 56). In contrast, the plaintiff points to nothing in the record to show that he would be able to perform the essential functions of his job on November 7, 1995. At any rate, because Mr. Tuszkiewicz never argued that the defendant made the adverse employment decision on November 7, 1995, he has waived his right to allege that Allen–Bradley discriminatorily discharged him on that date. *See State ex rel Edgar v. City of Chicago*, 942 F.Supp. 366, 370 (N.D.Ill.1996) (finding that because the plaintiffs did not discuss or cite a particular statute, the court "had no choice but to deem to argument completely waived").

Because Mr. Tuszkiewicz has failed to prove a prima facie case of disability discrimination, I will grant the defendant's motion for summary judgment as to his disparate treatment claim.

### B. Failure to Accommodate

▇ Mr. Tuszkiewicz's failure to accommodate claim appears to allege three different instances of alleged discrimination: (1) in December, 1994, when Allen–Bradley made the decision to terminate Mr. Tuszkiewicz; (2) on July 7, 1995, when Allen–Bradley allegedly determined, without speaking with Mr. Tuszkiewicz, that no accommodation was available; (3) and on November 7, 1995, when Mr. Tuszkiewicz returned from his medical leave. Two of these allegations fail for the same reason as his disparate treatment claim: he does not meet his burden of proving that he was a qualified individual with a disability at the times that Allen–Bradley allegedly failed to accommodate him. The third fails because Allen–Bradley was not aware that Mr. Tuszkiewicz's had a disability when he returned to work on November 7, 1995.

The ADA specifically provides that a failure to accommodate is discrimination. 42 U.S.C. § 12112(b)(5); *Bultemeyer v. Fort Wayne Community Sch.*, 100 F.3d 1281, 1283 (7th Cir.1996). In order to recover under a failure to accommodate claim, a plaintiff must show: (1) that he is a disabled individual as defined by the ADA; (2) that his employer was aware of his disability; and (3) that he was a "qualified individual" as defined by the ADA. *Best v. Shell Oil Co.*, 107 F.3d 544, 547–48 (7th Cir.1997).

For the reasons discussed above, Mr. Tuszkiewicz was not an "otherwise qualified individual with a disability" in December, 1994. The same reasoning applies here: the plaintiff simply did not prove that Mr. Tuszkiewicz was able to perform the essential functions of his job on those dates.

▇ Mr. Tuszkiewicz has also not proved that he could have performed the essential functions of his job on July 7, 1995. Mr. Tuszkiewicz filed the long term disability leave application, discussed above, approximately two weeks before Allen–Bradley allegedly failed to accommodate him. It is in this application that Mr. Tuszkiewicz states that he is *unable to work* and that Dr. Deckard states that Mr. Tuszkiewicz *should not work*. Indeed, the plaintiff alleges that it was his filing of the long-term disability application that prompted Allen–Bradley to state to its insurance carrier that it was impossible to accommodate Mr. Tuszkiewicz.

The plaintiff, in his opposition brief, states that while he was on medical leave on July 7, 1995, Allen–Bradley "unilaterally" determined that no accommodation was available and that "[t]his fact alone defeats Allen Bradley's motion for summary judgment with regard to the failure to accommodate claim;" I believe that this statement is incorrect. Allen–Bradley had no duty to accommodate if Mr. Tuszkiewicz was not an "otherwise qualified individual," and since Mr. Tuszkiewicz has not shown that he could perform the essential functions of his job at that time, he could not then be classified as a qualified individual.

▇ The only remaining date on which Allen–Bradley allegedly failed to accommodate Mr. Tuszkiewicz is November 7, 1995, the day he returned to work. While the court could find that Mr. Tuszkiewicz also has not meet his burden of showing that he was able to perform the essential functions of his job on that day, as discussed above, the record clearly establishes that Allen–Bradley was not aware of his disability on that day.

Thus, Mr. Tuszkiewicz cannot proceed on this claim.

In order to be held liable for a failure to accommodate, an employer must be aware that its employee suffers from a condition that would necessitate the accommodation. "An employee has the initial duty to inform the employer of a disability before ADA liability is triggered for failure to provide accommodations." *Hunt–Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago,* 104 F.3d 1004, 1012 (7th Cir.1997). Because the plaintiff has offered nothing to show that Allen–Bradley was aware that Mr. Tuszkiewicz would have to be closely monitored upon his return, he has not presented a genuine issue of material fact on the question of whether accommodations should have been provided for him. It is undisputed that Dr. Deckard sent a letter to the defendant, stating that Mr. Tuszkiewicz would be able to return to work "without restrictions" and that Dr. Deckard would see Mr. Tuszkiewicz in another year. Mr. Tuszkiewicz claims that the doctor intended the phrase "without restrictions" to mean only "physical restrictions" and that Dr. Deckard intended that Mr. Tuszkiewicz return to work three days a week. Even if this allegations are true, however, the plaintiff has not provided any evidence that the defendant was aware at the time of the November 7, 1995 meeting of any intended restrictions.

The plaintiff stresses the fact that Dr. Myers made a phone call to Mr. Schwartz regarding her request to accompany Mr. Tuszkiewicz to his back to work meeting. This call, the plaintiff argues, proves that the defendant was aware that Mr. Tuszkiewicz needed accommodations for his disability. The undisputed facts, however, show that although Dr. Myers told Mr. Schwartz that she had concerns about whether he could do his job, she did not request that Allen–Bradley give Mr. Tuszkiewicz any accommodations. As mentioned above, it is the employee's duty to inform the employee that an accommodation is requested. *See Hunt–Golliday,* 104 F.3d at 1012 (*"After an employee's request,* both parties bear responsibility for determining what accommodation is necessary.") (emphasis in original); *Bultemeyer v.*

*Fort Wayne Community Sch.,* 100 F.3d 1281, 1285 (7th Cir.1996) ("An employee's request for reasonable accommodation requires a great deal of communication between the employee and employer.").

Finally, Mr. Tuszkiewicz argues that his statement, at the beginning of his back to work meeting, that he was glad that Ms. Adams was there because there were things that he wanted to her to watch because of his hydrocephalus, shows that the defendant should have reasonably accommodated him. This one statement is not communication that rises to the level of giving Allen–Bradley sufficient notice that Mr. Tuszkiewicz needed an accommodation, especially given the doctor's letter that Mr. Tuszkiewicz could return to work without restrictions and his appearing on time at the meeting, properly dressed, acting like himself, remembering persons, and asking specific questions about them.

The court of appeals for the seventh circuit has found, on facts similar to the case at hand, that the plaintiff did not give her employer enough information to hold it responsible for failing to accommodate her. The court, noting that "'reasonable accommodation' is limited by the employer's knowledge of the disability," said that an employee who "simply returned to work" without requesting "a change of shifts or modifications of facilities or suggest any other accommodation for her mental state" did not notify her employer that she needed any accommodations. *Hunt–Golliday,* 104 F.3d at 1012–13. Specifically, the court relied on her doctor's return to work letter, which "stated that she was capable of working" and mentioned "nothing about her needing any special accommodations for a mental condition." *Hunt–Golliday,* 104 F.3d at 1013.

■ Even if Mr. Tuszkiewicz had given Allen–Bradley sufficient notice that he was requesting an accommodation, he has not shown that any accommodation would be reasonable, given the undisputed facts that Mr. Tuszkiewicz had indeed committed ethical violations. There is no duty to accommodate an employee who the employer has already determined to be in violation of its ethics policy and practice. *See Despears v. Milwaukee County,* 63 F.3d 635, 637 (7th Cir.

1995) ("It is true that the Americans with Disabilities Act ... require[s] the employer to make a reasonable accommodation of an employee's disability, but we do not think it is a reasonably required accommodation to overlook infractions of law.").

Because Mr. Tuszkiewicz has not shown that he could perform the essential functions of his job in December, 1994, or on July 7, 1995, and because he has not shown that the employer was aware of his disability on November 7, 1995, I will grant Allen–Bradley's motion for summary judgment as to Mr. Tuszkiewicz's claim that the defendant failed to accommodate his disability.

Therefore, IT IS ORDERED that Allen–Bradley's motion for summary judgment be and hereby is granted.

IT IS ALSO ORDERED that the clerk of court be and hereby is directed to dismiss this action, with prejudice.